UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
CHARLES W. JONES,

                        Plaintiff,

        -against-                          <u>MEMORANDUM & ORDER</u>
                                           12-CV-4051(JS)(GRB)
BAY SHORE UNION FREE SCHOOL DISTRICT,
PETER J. DION, individually and as
Superintendent of the Bay Shore Union
Free School District, EVELYN BLOISE
HOLMAN, individually and as the former
Superintendent of the Bay Shore Union
Free School District, and ROBERT PASHKEN,
individually and as Principal of Bay
Shore High School,

                        Defendants.
---------------------------------------X
APPEARANCES
For Plaintiff:          E. Christopher Murray, Esq.
                        Laura Nazginov, Esq.
                        Ruskin Moscou Faltischek, P.C.
                        East Tower, 15th Floor
                        1425 RXR Plaza
                        Uniondale, NY 11556


For Defendants:         Steven C. Stern, Esq.
                        Kaitlyn R. McKenna, Esq.
                        Mark A. Radi, Esq.
                        Susan Hull Odessky, Esq.
                        Sokoloff Stern, LLP
                        179 Westbury Avenue
                        Carle Place, NY 11514


SEYBERT, District Judge:

        Plaintiff Charles W. Jones ("Jones" or "Plaintiff")

commenced this action against defendant Bay Shore Union Free School

District, (the "District"), Peter J. Dion ("Dion"), Evelyn Bloise

Holman ("Holman"), and Robert Pashken ("Pashken") (collectively

"Individual Defendants", and taken together with the District, "Defendants"), alleging violations of Plaintiff's constitutional rights secured by the First and Fourteenth Amendments and for deprivation of Plaintiff's equal protection and due process right secured by the Fourteenth Amendment, as well as New York State constitutional and statutory violations and common law causes of action. (Sec. Am. Compl., Docket Entry 22, ¶¶ 38-53.) Currently pending before the Court is Defendants' motion for summary judgment. (Docket Entry 47.) For the following reasons, Defendants' motion is GRANTED.

BACKGROUND[1]

I.  Factual Background[2]

This action arises out of Plaintiff's previous employment at Bay Shore High School, current activism, and desire

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements ("Defs.' 56.1 Stmt." and "Pl.'s 56.1 Counterstmt.") and their evidence in support. Any factual disputes will be noted. The Court notes that Plaintiff's 56.1 Counterstatement includes a section entitled "Plaintiff's Statement" containing twelve paragraphs listed A-B, before responding to each paragraph of Defendants' 56.1 Statement.

[2] Before providing a factual background, the Court must address the parties' arguments that each failed to comply with the Local Civil Rules. Defendants argue that Plaintiff failed to provide, among other things, citations to any evidence or provide citations to evidence that do not contradict the allegations to which Plaintiff denies. (See Defs.' Br., Docket Entry 47-13, at 6-9.) As a result, Defendants request that the statements be deemed admitted. (See Defs.' Br. at 11.) Plaintiff contends that Defendants' Rule 56.1 Statement is too long and contains inadmissible hearsay. (See Pl.'s Br., Docket Entry 50, at 20-

to establish a minority parents' organization within the District. (Defs.' 56.1 Stmt., Docket Entry 41, ¶¶ 1, 187-190.) Plaintiff claims that in retaliation for his criticism of the District and that he intended to speak about the treatment of minority students, he was prohibited from attending or speaking at a December 14, 2011 meeting of the District's Board of Education. (Defs.' 56.1 Stmt. ¶¶ 230, 235-44; Pl.'s 56.1 Counterstmt., Docket Entry 42, ¶ I at 4.) Defendants' dispute this, claiming that Plaintiff was prohibited from attending the meeting because of the prior practice of restricting Plaintiff's presence on campus, and the serious

---

22.) Defendants argue that the statements are not being offered for the truth of the matter asserted; rather, to demonstrate the basis for Defendants' motivation. (See Defs.' Reply Br., Docket Entry 52, at 9.) Plaintiff asserts that the statements should still be deemed inadmissible under FED. R. EVID. 403 as unfairly prejudicial. (See Pl.'s Br. at 22-24.) The Court is sympathetic to the parties' concerns. First, it should be noted that the mere fact that a Local Rule 56.1 Statement is lengthy does not render it in violation of the Rule. See, e.g., Capitol Records, LLC v. Vimeo, LLC, 972 F. Supp. 2d 500, 509 (S.D.N.Y. 2013 (denying motion to strike and finding that a "ninety-page, 403-paragraph 56.1 statement" was not unduly lengthy "in light of the numerous and complex issues raised . . . and the large body of evidence"). The Court will also take a practical approach when evaluating the instant motion and will disregard the portions of the parties' Rule 56.1 Statements that are not compliant with Local Rule 56.1 and base its assessment of the underlying summary judgment motion primarily on the supporting evidence submitted by the parties. DeRienzo v. Metro. Transp. Auth., Metro N. Commuter R.R., 237 F. App'x 642, 646 (2d Cir. 2007) ("a district court has 'broad discretion' . . . to overlook a party's failure to comply with local court rules' and may 'opt to conduct an assiduous review of the record . . . .'") (quoting Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001)) (ellipsis in original).

safety concerns raised by his desire to appear on campus and have access to students.  (Defs.' 56.1 Stmt. ¶¶ 233-253.)

A.    <u>Plaintiff's Employment with the District</u>

Plaintiff was a girls' junior varsity softball coach in the District between 1983 and 1985.  (Defs.' 56.1 Stmt. ¶¶ 1, 13.) Plaintiff coached girls who were in the eighth through tenth grades and who ranged in age from thirteen to fifteen years old.  (Defs.' 56.1 Stmt. ¶¶ 14-15.)  In 1985, two female students told James McGowan ("McGowan"), a social worker for the District, that they had been to Plaintiff's house and that several girls had engaged in sexually explicit acts with Plaintiff.[3]  (Defs.' 56.1 Stmt. ¶¶ 12, 16, 18-19.)

On April 30, 1985, the District Superintendent at that time met with Plaintiff, (Defs.' 56.1 Stmt. ¶ 36), and informed him that a parent was alleging that he was either "having sex or giving drugs to her daughter."  (Defs.' 56.1 Stmt. ¶ 38; Jones Tr.,[4] 166:14-167:18.)  The Superintendent also informed Plaintiff that he was not to see or contact any of the students, nor attend

---

[3] Plaintiff also deems these paragraphs as well as paragraphs 19-70, 73-80, 93-125, 137-40, 150-64, 174-75, 182, 185, 195-98, 200-01, 203-04, 217, 232-34, 245, 292, 294-309, 317-19, and 373-87 as inadmissible hearsay; an argument that the Court addressed <u>supra</u>.

[4] The pages of Jones Deposition Transcript can be found at Defs.' Ex. D, Docket Entry 47-3 (pp. 1-175); Defs.' Ex. E, Docket Entry 47-4 (pp. 176-315); and Defs.' Ex. F, Docket Entry 47-5 (pp. 316-473).

practice or be on school grounds until further notice, and that Plaintiff was suspended with pay during the pendency of an investigation. (Defs.' 56.1 Stmt. ¶ 37; May 1, 1985 Insubordination Letter, Defs.' Ex. N, Docket Entry 47-11, at 2-3[5].) Plaintiff denies ever meeting with the Superintendent on April 30, 1985, and denies being told that he was suspended with pay and not to see or contact any students during the investigation of the charges. (Pl.'s 56.1 Counterstmt. ¶¶ 36-38; Jones Tr., 157:9-159:8.)

On May 7, 1985, the District charged Plaintiff with: (1) entertaining four minor female students of the District at his home; (2) engaging "in kissing, hugging, and other sexual acts, including fondling the breasts of, kissing the breasts of, rubbing his genital area against the genital area of a minor female student," and on two occasions "permitting, and/or causing, said student to rub his penis through his clothes," and (3) engaging "in kissing, hugging and touching of a minor female student" of the District. (Defs.' 56.1 Stmt. ¶ 77-78; Notice of Charges and Hearing, Defs.' Ex. O, Docket Entry 47-11, at 4-9.) A hearing was held on November 15, 1985, and Plaintiff and the District reached an agreement in which Plaintiff agreed to resign. (Defs.' 56.1

---

[5] When citing to Exhibits other than transcripts, the Court will use the page numbers generated by the Electronic Case Filing System.

Stmt. ¶¶ 79, 81-82; Nov. 15, 1985 Meeting Minutes, Defs.' Ex. P, Docket Entry 47-11, at 10-27.)   As part of the agreement, the parties exchanged mutual releases and agreed that the records would be kept in confidence by the District.  (Defs.' 56.1 Stmt. ¶ 84; Nov. 15, 1985 Meeting Minutes, at 15.)  The parties further agreed that Plaintiff would not seek or accept future employment with the District, while the District agreed to withdraw all the pending charges and acknowledge that Plaintiff denied any wrong doing and had maintained his innocence regarding the charges.  (Defs.' 56.1 Stmt. ¶ 83; Nov. 15, 1985 Meeting Minutes, at 14-15.)

Plaintiff disputes Defendants' allegations regarding the misconduct and denies "ever engaging in any improper conduct with any student or underage minor, whether at the Bay Shore High School, Middle School, or any other place."  (Jones Aff., Pl.'s Ex. 4, Docket Entry 49-4, at 2, ¶ 2.)

B.   Plaintiff's Return to Bay Shore

In 1997 or 1998, McGowan asked to meet with Holman, the District Superintendent at the time, to discuss Plaintiff.  (Defs.' 56.1 Stmt. ¶¶ 5, 87.)   It had come to McGowan's attention that Plaintiff had either been appointed or volunteered to be the education liaison for the NAACP.  (Defs.' 56.1 Stmt. ¶¶ 88, 90.) McGowan shared with Holman some of the information he knew about Plaintiff's history with the District from the 1980s.  (Defs.' 56.1 Stmt. ¶¶ 91, 93-94.)  Holman was also informed by McGowan and

others that Plaintiff was spotted on the girls' track field. (Defs.' 56.1 Stmt. ¶¶ 96-97.)

After her meeting with McGowan, Holman requested and reviewed all the written material that documented Plaintiff's employment with the District. (Defs.' 56.1 Stmt. ¶¶ 99-101.) Holman also reached out to the former Superintendent who handled the allegations against Plaintiff and his resignation, as well as the District's counsel, who had handled Plaintiff's disciplinary matter for the District in 1985. (Defs.' 56.1 Stmt. ¶¶ 103-05.) Additionally, on January 22, 1998, Holman and McGowan met with one of Plaintiff's former students and an alleged victim, to discuss the events of the spring of 1984 involving Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 107-08.)

In response to receiving the information regarding Plaintiff, Holman informed the NAACP representative that she would prefer not to have Plaintiff as the educational liaison, and through counsel, informed Plaintiff that he was not permitted on campus. (Defs.' 56.1 Stmt. ¶ 121.) Holman also sought clarification as to what her responsibilities were with respect to reporting Plaintiff's alleged misconduct, which she had just become aware of. (Defs.' 56.1 Stmt. ¶ 121.)

C.    Report to the N.Y.S. Department of Education

In June 1998, the N.Y.S. Department of Education advised the District that it "was required to file a Part 83 Report once

7

he received information which led him to reasonably conclude that a certificate holder had engaged in conduct which exhibited poor moral character.  The passage of time would not, in my opinion, relieve the obligation."   (June 15, 1998 Letter, Defs.' Ex. S, Docket Entry 47-11, at 32-33; Defs.' 56.1 Stmt. ¶ 124.)  Part 83 of the N.Y.S. Commissioner of Education's Regulations provides that:

> Any information indicating that an individual holding a teaching certificate has been convicted of a crime, or has committed an act which raises a reasonable question as to the individual's moral character, shall be referred by the chief school administrator having knowledge thereof to the professional conduct officer of the department.

(Defs.' 56.1 Stmt. ¶ 126; 8 N.Y. Comp. Codes R. & Regs. 83.1.) The N.Y.S. Department of Education advised Holman that the Superintendent is required to report any sexual misconduct by a teacher or counselor.  (Defs.' 56.1 Stmt. ¶ 127.)  Once reported, the N.Y.S. Department of Education is obligated to investigate accusations of sexually inappropriate behavior between staff and students.  (Defs.' 56.1 Stmt. ¶ 128.)

In 1990, Plaintiff applied to the N.Y. State Education Department for a provisional certificate as a school social worker (Defs.' 56.1 Stmt. ¶ 129), and in 1993 applied for a permanent school social work certificate.  (Defs.' 56.1 Stmt. ¶ 130.)  From

1990 through 2002, Plaintiff was employed as a school social worker with Western Suffolk BOCES. (Defs.' 56.1 Stmt. ¶ 131.)

On July 28, 2000, the Commissioner of Education issued a Notice of Substantial Question as to Moral Character pursuant to Part 83 of the Regulations of the Commissioner of Education based on allegations that Plaintiff had failed to truthfully answer the following questions on his licensing applications: (a) "Have you ever resigned from a position rather than face disciplinary action?" and (b) "Has any disciplinary action been brought against you which resulted in your being discharged from employment?" (Defs.' 56.1 Stmt. ¶¶ 132-33.) Plaintiff requested and was granted a hearing concerning these allegations. (Defs.' 56.1 Stmt. ¶¶ 134-35.) The hearings were held on December 7, 2000 and February 15, 2001, and in a decision issued on June 18, 2011, the hearing officer determined that Plaintiff gave false answers on his licensing applications in order to mislead state officials and recommended that Plaintiff's social work license be revoked. (Mar. 1, 2002 App. Decision, Defs.' Ex. W, Docket Entry 47-11, at 61-71; Defs.' 56.1 Stmt. ¶¶ 135, 140.) Plaintiff appealed the determination and on March 1, 2002, the Commissioner of Education upheld the hearing Officer's recommendation and determined that Plaintiff intentionally made false statements on his licensing applications. (Mar. 1, 2002 App. Decision; Defs.' 56.1 Stmt. ¶¶ 142-43.) In the March 1, 2002 decision, the Commissioner of

Education revoked Plaintiff's social worker certificate. (Mar. 1, 2002 App. Decision; Defs.' 56.1 Stmt. ¶ 146.)

Plaintiff left his BOCES position in 2002 after injuring himself on February 26, 2002 and is on permanent disability, collecting lifetime social security disability and workers' compensation benefits. (Defs.' 56.1 Stmt. ¶¶ 147-48.)

### D. Plaintiff Prohibited from District Property

Once Holman became familiar with Plaintiff's history with the District, Holman recommended to the District's School Board that Plaintiff be sent a letter prohibiting him from appearing on campus. (Defs.' 561. Stmt. ¶ 151.) By letter dated January 23, 1998, the District's attorney informed Plaintiff that he was not permitted on Bay Shore school property for any purpose.[6] (Defs.' 56.1 Stmt. ¶ 158; Jan. 23, 1998 Letter, Defs.' Ex. R, Docket Entry 47-11, at 30-31.) The letter further advised Plaintiff to "limit or clear all phone contacts to Bay Shore Schools through the Superintendent's Office. The circumstances surrounding your former employment should inform you of the basis

---

[6] Plaintiff disputes receiving the letter and claims he can't recall it and that "[i]t doesn't ring a bell of familiarity to me." (Jones Tr. 299:18; Pl.'s 56.1 Counterstmt. ¶ 158.) However, contrary to Plaintiff's assertion in his 56.1 Counterstatement, Plaintiff does admit to receiving a letter at some point saying he was not allowed on campus. (Jones Tr. 304:20-305:16.)

for this request." (January 23, 1998 Letter; Defs.' 56.1 Stmt. ¶ 161.)

Plaintiff violated the directive and attended a meeting on school grounds. (Defs.' 56.1 Stmt. ¶¶ 162-63.) By letter dated January 11, 2000, Plaintiff was informed by the District's attorney that if he was found on District property again, he would be removed and arrested for Criminal Trespass. (Jan. 11, 2000 Letter, Defs.' Ex. T., Docket Entry 47-11, at 34-35; Defs.' 56.1 Stmt. 163-64.)

E.    Plaintiff's Daughter Attends District Schools

Plaintiff's daughter, Damalii Jones ("Damalii"), was a student in the District from eighth grade through twelfth grade. (Defs.' 56.1 Stmt. ¶¶ 2-3.) Damalii lived with Plaintiff from the middle of eighth grade through twelfth grade. (Defs.' 56.1 Stmt. ¶ 165.) In light of Plaintiff having a child enrolled in the District, by letter dated February 13, 2008, the District's counsel once again wrote to Plaintiff regarding his prohibition from school grounds. (Defs.' 56.1 Stmt. ¶¶ 166-167.) However, this letter modified the original directive, stating:

> You are still barred from entering upon school
> district property. If it becomes necessary
> for you to enter upon school district property
> for reasons bearing directly upon your child's
> education, then you are directed to
> communicate with the Office of the
> Superintendent of Schools to seek permission
> to enter upon school district property, If,
> in the Superintendent's judgment your stated

> purpose is sufficiently compelling to warrant
> a temporary lifting of the prohibition, you
> will be permitted to enter school district
> property for the limited purpose of attending
> to your child's educational need.  Once you
> conclude the business for which permission has
> been granted, you will be required to
> immediately remove yourself from district
> property and the prohibition will resume its
> force and effect.

(Feb. 13, 2008 Letter, Defs.' Ex. Y., Docket Entry 47-11, at 74-74; Defs.' 56.1 Stmt. ¶ 168.)

On November 19, 2009, Holman sent Plaintiff a letter enclosing the February 13, 2008 letter.  (Defs.' 56.1 Stmt. ¶ 169.) Plaintiff responded on December 7, 2009, requesting the reasons for the directive.  (Defs.' 56.1 Stmt. ¶ 170.)  Holman replied to Plaintiff on December 14, 2009. Stating: "Given your history with this district, it would not be appropriate for me to engage in dialogue with you regarding the reasons for Mr. Spirn's February 13, 2009 letter."  (Dec. 14, 2009 Letter, Defs.' Ex. BB, Docket Entry 47-12, at 3-4.)  Plaintiff replied to Holman by letter dated December 17, 2009, accusing her of "Intentional Racial Discriminatory Bias" and demanding information regarding the District's "normal protocol for anyone coming onto the Bay Shore School District's property."  (Dec. 17, 2009 Letter, Defs.' Ex. CC, Docket Entry 47-12, at 5-6.)  On December 18, 2009, Holman responded to Plaintiff by letter, stating that she had already responded to his inquiry about the protocol to be followed but

that he should "[r]est assured, however, I will facilitate any request for access that you may wish to make in accordance with this protocol." (Dec. 18, 2009 Letter, Defs.' Ex. DD, Docket Entry 47-12, at 7-8.)

Despite the directives, Plaintiff did not inform the District prior to going on campus. (Defs.' 56.1 Stmt. ¶ 176.) Plaintiff testified that he didn't follow the modified protocol before accessing District property and "never asked," just went, and that he was never ejected from campus. (Jones Tr. 318:10-15; Defs.' 56.1 Stmt. ¶¶ 177-78.) Rather, Plaintiff was reminded that he was supposed to get approval from the Superintendent's office prior to appearing on campus. (Defs.' 56.1 Stmt. ¶ 179.)

F.  Superintendent Dion's Tenure in the District

Upon Holman's retirement, Peter Dion became Superintendent of Schools in July 2011. (Defs.' 56.1 Stmt. ¶ 180.) Dion and Plaintiff initially met on or about October 2011, in connection with a disciplinary matter involving Damalii. (Defs.' 56.1 Stmt. ¶ 181.) During the meeting, Dion and Plaintiff discussed establishing a minority parents' organization. (Defs.' 56.1 Stmt. ¶ 187.) The minority parents association sought office space in a District building to hold meetings and deal with the District. (Defs.' 56.1 Stmt. ¶ 194.) After the meeting, Dion called Plaintiff to arrange a meeting to discuss establishing a

minority parents' organization, or multi-cultural committee, in the District. (Defs.' 56.1 Stmt. ¶ 189.)

Sometime after their initial October 2011 meeting, and prior to December 2011, Dion learned about Plaintiff's past employment in the District and reviewed the District's file on Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 195-99.) Dion also spoke with former Superintendent Holman about the issues involving Plaintiff and inquired whether she know anything about Plaintiff's organization the Long Island Community Advocate Coalition ("LILAC"). (Defs.' 56.1 Stmt. ¶ 201-03.) Holman had no knowledge of LILAC. (Defs.' 56.1 Stmt. ¶ 204.)

LILAC is an organization that has no employees, no bank account, does not accept donations, no website, no bylaws, and while it tries to obtain grants, it has yet to successfully do so. (Defs.' 56.1 Stmt. ¶¶ 205-11.) After learning about Plaintiff's history with the District and not being able to find much information about LILAC, Dion canceled the meeting he had arranged with Plaintiff regarding the multi-cultural committee. (Defs.' 56.1 Stmt. ¶¶ 216-18.)

Plaintiff spoke with one member of Bay Shore's Board of Education, Guy Leggio, about establishing a minority parents' association, who was supportive of establishing such an association within the District. (Defs.' 56.1 Stmt. ¶¶ 225-26.) Plaintiff admits that he is not aware of any school board member

14

opposed to creating a minority parents' association in the District. (Defs.' 56.1 Stmt. ¶ 227; Pl.'s 56.1 Counterstmt. ¶ 227.)

Despite having never attended any meeting of the Bay Shore Board of Education, Plaintiff contacted Dion's office in December 2011 indicating his interest in attending the Board's December 14, 2011 meeting. (Defs.' 56.1 Stmt. ¶¶ 230-31.) Dion spoke with Board President Andrew Arcuri ("Arcuri"), about Plaintiff's request to attend and make a presentation at the Board meeting for his organization. (Defs.' 56.1 Stmt. ¶ 232.) It was then that Arcuri informed Dion of the District's practice of having anyone who wished to present to the Board, submit something in writing. (Defs.' 56.1 Stmt. ¶ 233.)

On December 8, 2011, Dion wrote to Plaintiff and indicated that he was recently made aware of the longstanding directive prohibiting Plaintiff from District property without the prior consent of the Superintendent and also acknowledged that Plaintiff had indicated an interest in attending the December 14, 2011 Board of Education meeting. (Defs.' 56.1 Stmt. ¶¶ 235-36.) In that same letter, Dion asked Plaintiff to memorialize his concerns in writing before Dion would consider his request regarding the meeting. (Defs.' 56.1 Stmt. ¶ 237.)

In a letter dated December 14, 2011, Plaintiff wrote that he wanted to seek assistance in re-establishing a minority

parents' association and that LILAC has "assisted students within the Bay Shore School District." (Dec. 14, 2011 Letter, Defs.' Ex. HH, Docket Entry 47-12, at 59-61; Defs.' 56.1 Stmt. ¶¶ 238-39.) Plaintiff concluded his letter by stating, "[t]he Long Island Community Advocate Coalition, Inc., looks forward to establishing a mutually respectful and productive alliance with the professionals and students within the Bay Shore School District." (Pl.'s Dec. 14, 2011 Letter at 61.)

Dion responded to Plaintiff's written request in a letter reminding Plaintiff that he is not permitted on District property without authorization, but stated that Plaintiff may submit LILAC's requests in writing to him, and he would present any written material to the Board of Education. (Defs.' 56.1 Stmt. ¶¶ 241, 243; Dion's Dec. 14, 2011 Letter, Defs.' Ex. II, Docket Entry 47-12, at 62-63.) The letter also informed Plaintiff that he was not authorized to attend the Board of Education meeting, and would be subject to arrest as a trespasser if he did. (Defs.' 56.1 Stmt. ¶ 244; Dion's Dec. 14, 2011 Letter.)

As Superintendent, Dion considered it his number one role to look out for the safety of students and employees. (Defs.' 56.1 Stmt. ¶ 246; Dion Tr., Defs.' Ex. F, Docket Entry 47-7, at 42-73, 34:18-21.) Dion did not permit Plaintiff to attend the meeting because he was concerned that Plaintiff wanted to "assist" students in the District. (Dion Tr. 50:15-52:3; Defs.' 56.1 Stmt.

¶ 247.)  Because Plaintiff's request to attend the board meetings,
which take place on District property and which many students
attend, had nothing to do with Plaintiff's daughter, Dion was
concerned that Plaintiff wanted to have access to students.
(Defs.' 56.1 Stmt. ¶¶ 248-251; Dion Tr. 34:24-35:23; 65:20-66:13,
74:6-75:9.)

Plaintiff responded to being barred from the
December 14, 2011 meeting by writing an additional letter. (Defs.'
56.1 Stmt. ¶ 254.)  Plaintiff's letter accuses Dion and the Board
of Education of acting "as though you are 'overseers on the
plantation.'"  (Jones 2nd Dec. 14, 2011 Letter, Defs.' Ex. JJ,
Docket Entry 47-12, at 64-65; Defs.' 56.1 Stmt. ¶ 256.)

In a letter dated December 16, 2011, Dion responded:

> I am in receipt of your letter to me dated
> December 14, 2011.  This is not the first time
> that you have been reminded by the
> Superintendent's Office that you may not come
> upon School District property without the
> Superintendent's prior knowledge and consent.
> You are well aware of the historical reason
> for that approval process, and I see no
> purpose in revisiting that issue.  I know that
> your daughter is enrolled in our schools and
> you may wish to attend to you daughter's
> school needs as her parent.  As you know, we
> recently had a professional meeting in my
> Office to discuss the situation surrounding
> your daughter's educational program here at
> Bay Shore.  To that end, if there is a need
> for you to visit the District, you will need
> to adhere to this simple process.  I will
> expedite all of your requests to visit to
> ensure your active involvement in your
> daughter's program.

> I understand that you disagree with this
> process, but it remains in place.

(Dec. 16, 2011 Letter, Defs.' Ex. KK, Docket Entry 47-12, at 66-68; Defs.' 56.1 Stmt. ¶ 258.)  However, by letter dated February 13, 2012, Dion informed Plaintiff that Plaintiff was no longer banned from Board of Education meetings, but simply needed to provide the Superintendent with "advanced notice" of his presence. (Feb. 13, 2012 Letter, Defs.' Ex. LL, Docket Entry 47-12, at 69-70.)

G.  Damalii Jones

Plaintiff's daughter, Damalli, had a history of disciplinary issues throughout her time in the District. (Defs.' 56.1 Stmt. ¶ 269.)  On February 16, 2012, Damalii was involved in an assault on another student, during school hours, outside a local deli, which was captured on surveillance video. (Defs.' 56.1 Stmt. ¶¶ 273-91.)  As a result of Damalii's involvement with the assault, Bay Shore High School Principal Robert Pashken ("Pashken"), issued a Principal's suspension to Damalii and requested a Superintendent's hearing. (Defs.' 56.1 Stmt. ¶¶ 8, 327-28.)  The hearing took place at the High School, and among those who attended were Damalii, Plaintiff, Ms. Daniels (Damalii's mother), as well as an attorney who Plaintiff hired to represent Damalii, and a lawyer representing the District. (Defs.' 56.1 Stmt. ¶¶ 333-36.)

Prior to commencing a hearing, the attorneys engaged in discussion to resolve the matter, and the disciplinary matter was resolved. (Defs.' 56.1 ¶¶ 337, 340; Settlement of Disciplinary Proceeding, Defs.' Ex. SS, Docket Entry 47-12, at 90-93.) Plaintiff left during the negotiations. (Defs.' 56.1 Stmt. ¶ 338.) Damalii and her mother agreed to the resolution and both signed the agreement in which Damalii admitted her guilt, and agreed to a suspension for the remainder of the school year. (Defs.' 56.1 Stmt. ¶¶ 341-43, 345, 348; Settlement of Disciplinary Proceeding.) The District agreed to provide Damalii with home tutoring so she could timely graduate at the end of that year, which she did. (Defs.' 56.1 Stmt. ¶¶ 268, 347, 353, 357; Settlement of Disciplinary Proceeding.)

H.    Plaintiff's United States Department of Education Office of Civil Rights Complaint

Plaintiff filed a complaint with the United States Department of Education, New York Office for Civil Rights ("OCR") against the District. (Defs.' 56.1 Stmt. ¶ 371.) Plaintiff, inter alia, alleged that he was prohibited from attending the December 14, 2011 Board meeting and threatened with arrest because of his race or because he advocated on behalf of minorities and that he was threatened with arrest if he entered the grounds of Bay Shore High School. (Defs.' 56.1 Stmt. ¶ 372.)

OCR conducted an investigation and reviewed documentation submitted by Plaintiff and the District, and interviewed Plaintiff and District personnel. (Defs.' 56.1 Stmt. ¶¶ 373-75; Aug. 29, 2012 OCR Letter, Defs.' Ex. TT, Docket Entry 47-12, at 94-101.) Following its investigation, OCR found in the District's favor. (Aug. 29, 2012 OCR Letter.) OCR determined Plaintiff:

> did not provide and OCR did not find any evidence to support the [Plaintiff's] allegation that the District discriminated against him on the basis of his race, or, in the alternative, retaliated, by sending him a letter on December 14, 2011; and, threatening gin with arrest if he entered School grounds. Rather, OCR determined that the District had a legitimate non-discriminatory, non-retaliatory reason for sending the letter; namely, the District's well-documented directive, dating from 1998, restricting the [Plaintiff's] access to District grounds. Based upon the [Plaintiff's] alleged misconduct as a District employee, and that such a directive was consistent with the Policy. The [Plaintiff] did not provide and OCR did not find any evidence that the District's proffered reason was pretextual; OCR determined that during school year 2011-2012, nine individuals were banned from entering District property without proper authorization from the District, for misconduct, all of whom were of different races and had not engaged in protected activity.

(Aug. 29, 2012 OCR Letter.)

Plaintiff commenced this action on August 14, 2012. On November 19, 2012, Defendants moved to dismiss the Complaint

(Docket Entry 15), and on December 19, 2012, Plaintiff moved to cross-moved to amend the Complaint. (Docket Entry 16.) On May 28, 2013, the Court Granted in Part and Denied in Part Defendants' motion to dismiss, and Granted in Part and Denied in Part Plaintiff's cross-motion to amend. (Docket Entry 21.) On May 28, 2012, Plaintiff filed a Second Amended Complaint (Docket Entry 22), and on June 8, 2015, Defendants moved for summary judgment (Docket Entry 47).

## DISCUSSION

The Court will first address the applicable legal standard on a motion for summary judgment before turning to the parties' arguments.

## I. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary

judgment is sought."  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1611, 26 L. Ed. 2d 142 (1970).  A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2512.  To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256, 106 S. Ct. at 2514).  "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").  "The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)).  Thus, even if both parties move for summary judgment and assert the absence of

any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citation omitted).

II.   Plaintiff's First Amendment Claims

   A.   First Amendment Retaliation Claim Regarding Plaintiff's Exclusion from the December 14, 2011 Meeting

Defendants move for summary judgment claiming Plaintiff was excluded from campus for a legitimate, non-retaliatory reason and non-pretextual reason, having nothing to do with Plaintiff's speech; namely, the safety of students.  (Defs.' Br. at 11-14.) Defendants further assert that Plaintiff was denied access to Board meetings out of a concern the he was attempting to develop a relationship with the District through LILAC that would possibly give him access to students; once again demonstrating student safety as the only reason for the ban.  (Defs.' Reply Br. at 1-4.)  As discussed below, the Court finds that summary judgment is appropriate.

The elements of a First Amendment retaliation claim are dependent on the "factual context" of the case.  Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir, 2008).  In the context of

a private citizen's action against public officials, the private citizen must demonstrate: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that rights; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." <u>Curley v. Vill. of Suffern</u>, 268 F. 3d 65, 73 (2d Cir. 2001).

Plaintiff has adequately demonstrated an interest protected by the First Amendment: his right to advocate for minority students within the District at public meetings. However, Plaintiff has not put forth sufficient evidence to raise a triable issue of fact regarding whether Defendants' actions were motivated or substantially caused by Plaintiff's exercise of his right. Here, specifically, it is undisputed that Dion was more than willing to meet with Plaintiff to discuss the establishment of a minority parents' association. (Defs.' 56.1 Stmt. ¶ 190.) In fact, Plaintiff and Dion actually discussed the establishment of a minority parents' association when they met in October 2011 (Defs.' 56.1 Stmt. ¶¶ 181, 187), and Dion took the next step and called Plaintiff to set up another meeting to further discuss the establishment of such an organization (Defs.' 56.1 Stmt. ¶ 189). It was only after Dion learned of Plaintiff's history with the District and the prior directives banning Plaintiff from campus, that Dion cancelled the meeting. (Defs.' 56.1 Stmt. ¶¶ 195-218.)

The reason Plaintiff was asked to put his concerns in writing for seeking to attend the December 14, 2011 meeting was because of the preexisting longstanding directive requiring Plaintiff to obtain prior consent before entering District property. (Defs.' 56.1 Stmt. ¶¶ 235-37.) Plaintiff's desire to "assist" students in the District coupled with the fact that Board meetings are held on District property and many students usually attend, are what led the Board and Dion to ban Plaintiff from attending. (Defs.' 56.1 Stmt. ¶¶ 247-251; Dion Tr. 34:22-35:23;, 50:15-52:3, 65:20-66:13.)

Schools possess the right to "exercise ultimate authority for access to students, school buildings and school property." See Lloyd v. Grella, 83 N.Y.2d 537, 547, 634 N.E.2d 171, 175, 611 N.Y.S.2d 799 (1994). Additionally, schools have a duty to ensure that its students are safe. See Santer v. Bd. of Educ. of E. Meadow Union Free Sch. Dist., 23 N.Y.3d 251, 265, 13 N.E.3d 1028, 1039, 990 N.Y.S.2d 442 (2014) (internal citation omitted). The role of the Courts is not to "second-guess with hindsight the judgment of school administrators." DeFabio v. E. Hampton Union Free Sch. Dist., 658 F. Supp. 2d 461, 481 (E.D.N.Y. 2009). "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." Wood v. Strickland, 420 U.S. 308, 326, 95 S. Ct. 992, 1003, 43 L. Ed. 2d 214 (1975). Thus,

because the undisputed facts demonstrate the existence of a long-standing directive banning Plaintiff from District property and the inherent duty and authority of schools to ensure the safety of its students, there is no basis for finding a constitutional violation against Plaintiff in retaliation for speaking about minority issues. Accordingly, Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim is GRANTED.

B.  Damalii's Suspension Violated Plaintiff's First Amendment Right to Intimate Association

Plaintiff has not opposed Defendants' assertion that there is a lack of evidence that Damalii's suspension was related to Plaintiff's protected activity. "'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc., No. 07-CV-3662, 2009 WL 2997382, at *8 (E.D.N.Y. Sep. 15, 2009) (quoting Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

Upon review of Plaintiff's opposition brief, it is clear that Plaintiff does not oppose Defendants' argument. Accordingly, Plaintiff's claim of a violation of his First Amendment right to intimate association is DISMISSED.

III.  Plaintiff's Equitable Open Meetings Law Claim

Plaintiff seeks injunctive relief pursuant to New York's Open Meetings Law, alleging that Defendants' improperly barred him from public School Board meetings.  (Pl.'s Br. at 18-19.) Defendants' argue Plaintiff's claim is time-barred, moot, and legally insufficient.  (Defs.' Br. at 17.)

New York Public Officers Law § 103(a) states: "Every meeting of a public body shall be open to the general public . . . ."  N.Y. PUB. OFF. LAW § 103(a) (McKinney's 2016).  With respect to enforcement, the Public Officer's Law provides "[a]ny aggrieved person shall have standing to enforce the provisions of this article against a public body by the commencement of a proceeding pursuant to article seventy-eight of the civil practice law and rules, or an action for declaratory judgment and injunctive relief."  Id. § 107(1).  There is a four-month statute of limitations for Article 78 proceedings.  See N.Y. C.P.L.R. 217.1 (McKinney's 2016).  "Causes of action [that] were maintainable in an article 78 proceeding [ ] should have been commenced within four months."  Save Pine Bush, Inc. v. City of Albany, 70 N.Y.2d 193, 203, 512 N.E.2d 526, 529, 518 N.Y.S.2d 943 (1987); see also Atkins v. Town of Rotterdam, 266 A.D.2d 631, 632, 697 N.Y.S.2d 780, 781 (1999) (holding that the claim was subject to Article 78's four-month statute of limitations even though it was styled as a declaratory judgment action with a statute of limitations of

six years).  By its own terms, Open Meetings Law claims may be brought through an Article 78 proceeding, thus, the four-month statute of limitations governs.

Plaintiff's claim derives from Dion's December 11, 2014 letter banning him from attending School Board Meetings.  Thus, the four-month statute of limitations for Plaintiff's claim began to run on that date and expired on April 14, 2012.  This action was commenced on August 14, 2012, and therefore is untimely.  Even if measured from the last date on which the restriction was in effect, February 13, 2012, the claim is still untimely, as the claim would have expired on June 13, 2012.

Assuming arguendo that Plaintiff's claim was somehow timely, the claim still fails.  Courts "are restricted to deciding actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions . . . ." Coll. Standard Magazine v. Student Ass'n of State Univ. of N.Y. at Albany, 610 F.3d 33, 34-35 (2d Cir. 2010) (holding that court lacks jurisdiction over challenge to a policy that no longer exists thus claim must be dismissed as moot) (internal quotation marks and citation omitted).  Plaintiff's claim was rendered moot on February 13, 2012, when Dion lifted the ban prohibiting Plaintiff from attending School Board meetings.  There is no judgment that this Court could issue that could be effective since the prohibition is

no longer in place and Plaintiff is allowed to attend Board meetings.

To the extent that Plaintiff's claim can be construed as challenging the February 13, 2012 directive that he notify the Superintendent's office when he intended to appear on District property for a Board meeting or otherwise, this claim does not implicate the Open Meetings Law. "The purpose of the Open Meetings Law is to prevent public bodies from debating and deciding in private matters that they are required to debate and decide in public." Zehner v. Bd. of Educ. of Jordan-Elbridge Cent. Sch. Dist., 91 A.D.3d 1349, 1350, 937 N.Y.S.2d 510, 512 (4th Dep't 2012; see also Matter of Gordon v. Vill. of Monticello, 87 N.Y.2d 124, 126-27, 637 N.Y.S.2d 961, 963, 661 N.E.2d 691, 693 (1995). The statute's purpose is to direct boards to deliberate in public, which the Bay Shore School Board did. There is nothing in the statute limiting a board's authority to restrict access to an individual for safety reasons, while still keeping the meeting open to the general public.

Further, as discussed supra, regardless of whether this Court agrees with Defendants' assessment that Plaintiff's presence at the meeting presented a safety threat, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." Strickland, 420 U.S. at 326, 95 S. Ct. at 1003.

Prohibiting Plaintiff from the December 14, 2011 Board meeting because Defendants believed he presented a threat is not a violation of the Open Meetings Law.  See <u>Goetschius v. Bd. of Educ. of Greenburgh Eleven Union Free Sch. Dist.</u>, 281 A.D.2d 416, 417, 721 N.Y.S.2d 386 (2d Dep't 2001).  Accordingly, Plaintiff's Open Meetings Law claim is dismissed.

IV.  <u>Section 1983 Claims Against Individual Defendants</u>

Plaintiff brings claims against Individual Defendants Pashken, Holman, and Dion pursuant to 42 U.S.C. § 1983.  Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.  Section 1983 itself does not create substantive rights, rather, "it provides only a procedure for redress for the deprivation of rights established elsewhere."  <u>Sykes v. James</u>, 13 F.3d 515, 519 (2d Cir. 1993).  To prevail on a claim arising under Section 1983, a plaintiff must establish: "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law."  <u>Hawkins v. Nassau Cty. Corr. Facility</u>, 781 F. Supp. 2d 107, 111

(E.D.N.Y. 2011).  The Court addresses the arguments against each Individual Defendant below.

    A.    Defendant Pashken

        Consistent with Plaintiff's abandonment of his First Amendment right to intimate association, and the Court's subsequent dismissal of the claim for failure to oppose (see supra at 25-26), Plaintiff "does not contest the dismissal of the claims against defendant Robert Pashken."  (Pl.'s Opp. at 17, n.2.) Accordingly, Plaintiff's claims against Defendant Pashken are DISMISSED.

    B.    Defendant Holman

        Defendants' argue that claims against former Superintendent Holman should be dismissed because she did not engage in any unconstitutional activity, and the claims against her are untimely.  (See Defs.' Br. at 20-21.)

        Section 1983 itself does not provide a statute of limitations, see 42 U.S.C. § 1983, but "courts apply the statute of limitations for personal injury actions under state law."  Hogan v. Fisher, 738 F.3d 509, 517 (2d Cir. 2013) (citations omitted). For Section 1983 actions filed in New York, the applicable statute of limitations is Section 214 of the Civil Practice Law and Rules ("C.P.L.R."), which allows three years to file suit.  N.Y. C.P.L.R. § 214 (McKinney's 2016).  A cause of action under Section 1983 accrues when the plaintiff "knows or has reason to know of the

injury which is the basis of his actions." Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002) (internal quotation marks and citations omitted).

The Complaint only implicates Holman insofar as she was Superintendent in 1998 when the "School District . . . adopted a School District policy barring plaintiff from School District property." (Sec. Am. Compl. ¶ 22.) In 1998, after learning of Plaintiff's history with the District, Holman informed Plaintiff he was not permitted on campus. (Jones Tr. 294:15-23.) In 2008, Holman modified the campus ban to allow Plaintiff on campus only to attend to Damalii's educational needs. (Feb. 13, 2008 Letter; Defs.' 56.1 Stmt. ¶ 169.)

Upon reviewing Plaintiff's Complaint and Opposition to Defendants' motion, the Court concludes that Plaintiff's allegations against Holman all stem from the ban that was instituted in 1998. Plaintiff therefore is deemed to have known or had reason to know of his injuries since 1998. Plaintiff filed the instant action on August 14, 2012, fourteen years after the ban implemented by Holman, giving rise to Plaintiff's claim. Even if taken from the February 13, 2008, date on which Plaintiff was notified by letter that the ban was modified to allow him on campus to attend to his daughter's educational needs, Plaintiff's allegations against Holman are still untimely. Accordingly, Plaintiff's claims against Holman are dismissed as time-barred.

C.    Defendant Superintendent Dion

Defendants' assert that Superintendent Dion is entitled to qualified immunity for the decision to deny Plaintiff access to the December 14, 2011 Board meeting, as an extension of the decision to restrict his access to District property. (Defs.' Rep. Br. at 7.) Plaintiff argues that it was not reasonable for Dion to exclude Plaintiff from school property and retaliate against him for "criticizing the School District for the way they treated minority students." (Pl.'s Opp. at 17.) Because, as discussed supra, the Court has concluded that no rational jury could find that Plaintiff's constitutional rights were violated, the Court need not even reach the issue of qualified immunity. However, even assuming arguendo that there were disputed issues of fact as to whether a constitutionally protected interest existed and as to whether Dion violated that interest, the Court would find, for the reasons set forth below, that Dion is entitled to qualified immunity on the First Amendment claim.

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396

(1982)); <u>Mandell v. Cty. of Suffolk</u>, 316 F.3d 368, 385 (2d Cir. 2003). The Second Circuit has held that "'[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" <u>Luna v. Pico</u>, 356 F.3d 481, 490 (2d Cir. 2004) (quoting <u>Anderson v. Recore</u>, 317 F.3d 194, 197 (2d Cir. 2003)) (alterations in original); <u>McCullough v. Wyandanch Union Free Sch. Dist.</u>, 187 F.3d 272, 278 (2d Cir. 1999) ("A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right."). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (internal quotation marks and citation omitted). If there is no dispute as to the material facts, the issue of whether an official's conduct was objectively reasonable is an issue of law to be decided by the court. <u>Zellner</u>, 494 F.3d at 368; <u>see also</u> <u>Lennon v. Miller</u>, 66 F.3d 416, 421 (2d Cir. 1995) ("If there is no dispute about the material facts, the district court should assess the reasonableness of the defendants' conduct under the circumstances presented in order to determine on summary judgment whether the defendants are entitled to qualified immunity.").

The Court concludes that reasonable school administrators could disagree about whether Dion's banning of Plaintiff from the December 14, 2011 Board meeting violated Plaintiff's rights under the First Amendment. "There is no First Amendment right of access to a school board meeting." Cyr v. Addison Rutland Supervisory Union, 60 F. Supp. 3d 536, 546 (D. Vt. 2014). As this Court has held, school board meetings are only "limited" public fora. Jones v. Bay Shore Union Free Sch. Dist., 947 F. Supp. 2d 270, 278 (E.D.N.Y. 2013) (citation omitted); Hotel Emps. & Rest. Emps. Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 545 (2d Cir. 2002) (listing school board meetings as example of a limited public forum)). Because Plaintiff does not have a clearly established right to attend and present at a school board meeting, it's reasonable that school administrators could disagree over whether it was a proper exercise of discretion to ban Plaintiff from the Board meeting. Thus, summary judgment is GRANTED in favor of Defendants on the issue of qualified immunity.

V.    Monell Liability Against the District

Defendants also seek summary judgment on the issue of whether Plaintiff's First Amendment Retaliation claim against the District fails on Monell grounds. Plaintiff contends that as Superintendent, Dion was a policymaker for the District because he is Chief Executive Officer. (See Pl.'s Opp. at 14-15.) Plaintiff

argues that as a policymaker, Dion had authority to prohibit Plaintiff from attending the December 14, 2011 Board meeting in retaliation for Plaintiff's exercising of First Amendment rights, which is attributable to the District. (See Pl.'s Opp. at 14-15.)

It is well-settled that a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior." Pembaur v. City of Cincinnati, 475 U.S. 469, 478, 106 S. Ct. 1292, 1297, 89 L. Ed. 2d 452 (1986). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978). Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008).

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" Davis v. City of N.Y., 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following. He or she may allege

the existence of "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Brandon v. City of N.Y., 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Okla. v. Tuttle, 471 U.S. 808, 823-24, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

"Where a plaintiff seeks to hold a municipality liable for a single decision by a municipal policymaker, the plaintiff must show that the official had final policymaking power." City of Waterbury, 542 F.3d at 37 (internal quotation marks, alterations, and citation omitted). "[T]he critical inquiry is not whether an official generally has final policymaking

authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." Id. (citation omitted); see also Eldridge v. Rochester City Sch. Dist., 968 F. Supp. 2d 546, 562 (W.D.N.Y. 2013) ("An official may be a final policymaker as to some issues but not as to others."). "[T]he question of whether a given official is the . . . final policymaking official in a given area is a matter of law to be decided by the court" "before the case is submitted to the jury." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000) (internal quotation marks and citation omitted); see also City of Waterbury, 542 F.3d at 37 ("Whether an official has final policy-making authority is a legal question, determined on the basis of state law."). Moreover, "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." Jeffes, 208 F.3d at 57–58.

Under New York Education law, a Superintendent is subject to the direction and supervision of the Board of Education, and has no vote on Board decisions. N.Y. EDUC. LAW § 1711(2)(a),(3) (McKinney's 2011). Boards of Education have final authority over various matters, including the implementation and procedure of board meetings and regulating conduct on district property. N.Y.

EDUC. LAW §§ 1708-1709, 2801 (McKinney's 2011).  New York Education law gives the Superintendent the power "[t]o enforce all provisions of law and all rules and regulations . . . of the board of education," N.Y. EDUC. LAW § 1711, but not to promulgate or otherwise create rules, regulations, or policies of his own.  See id.  While a Superintendent may be a decision-maker, the Board of Education is the final policymaker.  See Hill v. N.Y. City Bd. of Educ., 808 F. Supp. 141, 151 (E.D.N.Y. 1992) (holding that the Director was not a policymaker and Board of Education was not liable under Monell because the Director was only delegated authority and "empowered to act only within the parameters of certain policies set by the Chancellor of the Board of Education and by the Board itself") (overruled on other grounds by Frankel v. Bally, Inc., 987 F.2d 86, 90 (2d Cir, 1993)).

Plaintiff has not alleged that the Board, or any of its members, retaliated against him for the content of his speech. (Defs.' 56.1 Stmt. ¶¶ 225-26; Pl.'s 56.1 Counterstmt. ¶¶ 225-26.) Further, Plaintiff has not alleged that he is aware of any Board member opposed to establishing a minority parents' association in the District.  (Defs.' 56.1 Stmt. ¶ 227; Pl.'s 56.1 Counterstmt. ¶ 227.)  Therefore, Plaintiff has failed to show that an official with final policymaking authority deprived him of his First Amendment rights.  Accordingly, summary judgment is GRANTED in favor of Defendants on the issue of Section 1983 Monell liability.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to enter judgment accordingly and CLOSE this case.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    March  16  , 2016
          Central Islip, New York